UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AURELIA MANCILLA,

Plaintiff,

-v.-

ABM INDUSTRIES, INC., SCOTT SALMIRS,
and EDDIE SANDERS,

Defendants.

---

20 Civ. 1330 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

The factual allegations underlying this case are horrific by any metric.
Plaintiff Aurelia Mancilla, who worked briefly as a night-shift janitor for ABM
Industries, Inc. ("ABM"), alleges that she was forcibly raped by her supervisor
shortly after she began her employment.  She brings this suit against
Defendants ABM and Scott Salmirs (together, the "ABM Defendants"), along
with Eddie Sanders, her alleged rapist, asserting state-law torts as well as
claims under Title VII of the Civil Rights Act of 1964, *codified as amended at* 42
U.S.C. § 2000e to 2000e-17.  The ABM Defendants have moved to compel
arbitration, citing an arbitration agreement to which Plaintiff ostensibly agreed
during her onboarding process at ABM.  Plaintiff opposes the motion, arguing
that the purported arbitration agreement is invalid and unconscionable.  For
the reasons set forth in the remainder of this Opinion, the Court is constrained
to grant the ABM Defendants' motion to compel arbitration and stays the
instant action against them.

## BACKGROUND[1]

### A.    Factual Background

### 1.    The Allegations in Plaintiff's Complaint

ABM is in the business of providing janitorial services for commercial facilities, including airports, in multiples states.  (Compl. ¶ 3).  Plaintiff commenced employment with ABM on July 31, 2018, performing janitorial work on the night shift at the Atlanta International Airport.  (*Id.* at ¶ 19).  She worked for ABM, as directed by ABM supervisors, without incident until September 18, 2018.  (*Id.* at ¶ 20).

Plaintiff reported to work on the night of September 17, 2018, and was informed that her ABM supervisor that night would be Defendant Eddie Sanders.  (Compl. ¶ 21).  Plaintiff had not previously been supervised by Sanders — indeed, until then she had never met him.  (*Id.*).  Plaintiff did the

---

[1]     The facts contained in this Opinion are drawn from Plaintiff's Complaint ("Compl." (Dkt. #1-2)); the Declaration of Rhonda Rawlins in Support of Defendant ABM's Motion to Compel Arbitration and Dismiss or Stay Action ("Rawlins Decl." (Dkt. #14)), including the exhibits thereto; the Declaration of Craig R. Benson In Support of Defendants' Motion to Compel Arbitration and Dismiss or Stay Action ("Benson Decl." (Dkt. #15)), including the exhibits thereto; the exhibits attached to Plaintiff's Memorandum of Law in Opposition to Defendant ABM's Motion to Compel Arbitration and Dismiss or Stay Action (Dkt. #23 at 26-55), including the Declaration of Aurelia Mancilla ("Mancilla Decl." (Dkt. #23 at 28-30)); and the Declaration of Rhonda Rawlins in Support of Defendant ABM's Motion to Compel Arbitration and Dismiss or Stay Action ("Rawlins Reply Decl." (Dkt. #27)), including the exhibits thereto.

For ease of reference, Defendants' Memorandum of Law in Support of Defendant ABM's Motion to Compel Arbitration and Dismiss or Stay Action is referred to as "Def. Br." (Dkt. #13); Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Compel Arbitration and Dismiss or Stay Action is referred to as "Pl. Opp." (Dkt. #23); and Defendants' Memorandum of Law in Further Support of ABM Defendants' Motion to Compel Arbitration and Dismiss or Stay Action is referred to as "Def. Reply" (Dkt. #26).

usual janitorial work required of her until approximately 5:00 a.m. on September 18, 2019, when Sanders approached her and engaged her in conversation as she continued her work.  (*Id.*).  During the conversation, Sanders suggested to Plaintiff that she should have sex with him.  (*Id.*).

After Plaintiff refused, Sanders directed Plaintiff to follow him to an area where he said cleaning work was required.  (Compl. ¶¶ 22-23).  Plaintiff did as directed and followed Sanders into a room with no windows and no exit except the door through which they had entered.  (*Id.* at ¶ 24).  At that point, Sanders, a very large man, closed the door and stood between Plaintiff and the door, demanding that she submit to him.  (*Id.* at ¶ 25).  Sanders proceeded to rape her; she begged him to stop.  (*Id.* at ¶ 26).  Sanders then left Plaintiff alone in the room.  (*Id.* at ¶ 28).

When Plaintiff was able to exit the room, she called a coworker and requested that the coworker call the police.  (Compl. ¶ 30).  The police arrived, talked with Plaintiff, investigated the incident, and escorted her to a hospital for a rape test.  (*Id.* at ¶ 31).  They also provided Plaintiff with rape crisis counseling.  (*Id.*).  The police subsequently arrested Sanders and charged him with rape.  (*Id.* at ¶ 32).  At the time the Complaint was filed, Sanders was awaiting trial.  (*Id.*).  Plaintiff alleges, upon information and belief, that Sanders has a criminal record that includes a felony conviction for armed robbery.  (*Id.* at ¶ 33).

## 2.    ABM's Onboarding Process and Plaintiff's Employment Agreement

The Court briefly describes the process by which Plaintiff was hired and onboarded, as it is relevant to this motion.  ABM uses a recruiting technology called Jobalign as an applicant tracking system during the hiring process. (Rawlins Decl. ¶ 6).  Applicants are required to provide contact information, including an email address, that is entered into the system.  (*Id.* at ¶ 7).

Once ABM has interviewed and offered an applicant a position, ABM electronically provides pertinent information to a third-party vendor, Sterling Talent Solutions ("Sterling"), so that Sterling may perform a background check and manage the employee's onboarding process.  (Rawlins Decl. ¶ 7).  The electronic transmission to Sterling occurs when a recruiter or hiring manager changes the candidate's status to "hired" and clicks the "onboard" button in Jobalign.  (*Id.*).

Sterling then sends the applicant (now candidate) an instructional email providing a username and temporary password, together with a link to the ABM Candidate Portal.  (Rawlins Decl. ¶ 8).  The process then follows the following steps:

- The first step in the process requires the candidate to click on the "Get Started" link in the email that directs the candidate to the ABM Candidate Portal.  Once directed, the candidate must enter their Username and Password into the browser.  Doing so provides access to the ABM Candidate Portal.

- The candidate's attention is drawn to their inbox, where they are tasked to "Review and Sign Job Offer Confirmation" and instructed to click on the "Launch

4

Task" link.  This link pulls up an electronic Job Offer Confirmation document that contains information about the candidate, the position, job site location, rate of pay, start/hire date, and pay frequency.  The candidate is instructed to review the information on the Job Offer Confirmation.

- The candidate is provided information on e-signing documents.  The candidate is asked to consent to use an electronic signature to electronically sign various forms.  In this regard, the candidate is provided with a Consent and Notice Regarding Electronic Signature which reads, in pertinent part:

> By clicking the "I agree to use an electronic signature" button, you agree to electronically sign the following forms.  You agree your electronic signature is the legal equivalent of your manual signature.  You further agree that your use of the keypad, mouse, or other device to select an item, button, icon or similar act/action, constitutes your signature as if actually signed by you in writing.  You also agree that no certification authority or other third-party verification is necessary to validate your electronic signature and that the lack of such certification or third-party verification will not in any way affect the enforceability of your electronic signature.

> If you decline to use an electronic signature by clicking the "I Decline to Use an Electronic Signature" button, you will be asked to enter your reason for declining.

> You should contact your employer to manually sign your document.  After authorizing the use of your electronic signature, you may still withdraw your consent.  To do so, you must contact the employer for their withdrawal procedures, and to understand any consequences or fees which may apply.

(*Id.*).  There are then two links for the candidate to choose: One provides "I Agree to Use an Electronic Signature," and the other states "I Decline to Use an Electronic Signature."  (*Id.* at ¶ 9).  If the candidate selects the "I Decline to Use an Electronic Signature" button, the candidate is asked to provide a reason for declining.  (*Id.*).  The process ends at this point and the candidate cannot move forward with electronic onboarding through Sterling.  (*Id.*).  The candidate may then contact ABM to manually sign the documents as an alternative to electronic signing; however, if the candidate chooses not to sign the documents manually or electronically, they may not continue the application process. (*Id.*).

If the candidate does agree to use an electronic signature, the candidate is given the choice of a button to select a signature or a button to draw an electronic signature.  (Rawlins Decl. ¶ 10).  If the candidate selects the "Signature" button, an electronic version of their name and their initials appears in cursive.  (*Id.*).  If the candidate selects the "Or draw your signature" button, the candidate has the option to draw their own electronic signature and initials to use going forward.  (*Id.*).  After selecting their preferred electronic signature format, the candidate is requested to click on the "Proceed to e-Sign Preview" button.  (*Id.*).

The candidate then receives an email from the Candidate Portal. (Rawlins Decl. ¶ 11).  The email advises the candidate that as part of their application with ABM, a pre-employment screening is required.  (*Id.*).  The email directs the candidate to review their rights under the Fair Credit

6

Reporting Act by visiting a link that is provided in the email. (*Id.*). It also instructs the candidate to visit a URL link to access the Applicant Certification and Authorization form to proceed to the pre-employment screening. (*Id.*).

Following successful completion of the background check, the candidate is considered an employee and is sent an email by Sterling from the Candidate Portal. (Rawlins Decl. ¶ 12). The employee is instructed to click the "Get Started" button to sign into the Candidate Portal and asked to complete and sign onboarding acknowledgment forms. (*Id.*). The Candidate Portal provides a list of electronic documents and policies that must be opened, reviewed, completed — and, if agreed, signed — in the following order: Form CC-305; EEO Form; Emergency Contact; W4; Biometric Clock; Policy Employee Notice and Consent Form; Direct Deposit Authorization; Pay Method Selection; Health Care Exchange Notice Acknowledgment; Wage Policy Acknowledgment; Employee (Service) Handbook Acknowledgement; Mutual Arbitration Agreement Acknowledgment; Employee Instructions, Information, and Work Rules Acknowledgment; Drug-Free Workplace Policy Acknowledgment; Customer Confidentiality Acknowledgement; Policy Against Harassment in the Workplace Acknowledgement; Prior Employer Information; Acknowledgement; and Code of Business Conduct ("COBC"). (*Id.* at ¶ 13). The employee is given unlimited time to read and review the policies. (*Id.* at ¶ 14).

Finally, the employee is asked to check their email account regularly for emails from the Candidate Portal. (Rawlins Decl. ¶ 15). If the employee has any difficulty completing this process, they are instructed to contact the Hiring

Manager or Human Resources Department.  (*Id.*).  This concludes the electronic onboarding process through Sterling and at this point the employee has been onboarded.  (*Id.*).

Notably, "log entries" maintained by Sterling and attached to the Rawlins Declaration indicate that Plaintiff followed the onboarding process.  (Rawlins Decl. ¶¶ 17, 19).  On August 16, 2018, a Job Offer Confirmation initial notification email was sent to Plaintiff.  (*Id.*).  The log entry reflects that Plaintiff accessed the Sterling Candidate Portal on August 31, 2018.  (*Id.*).  It also reflects that Plaintiff received ABM's Mutual Arbitration Agreement (Dkt. #14-1 at 1-3 (the "Mutual Arbitration Agreement")) and electronically signed the corresponding "Employee Acknowledgment" on August 31, 2018.  (Dkt. #14-1 at 4 ("Employee Acknowledgment"); Dkt. #14-2; *see also* Rawlins Decl. ¶ 18; Dkt. #14-3 at 2 (showing that Mutual Arbitration Agreement Acknowledgment was uploaded on August 31, 2018)).  The Mutual Arbitration Agreement states that:

> ABM Industries Incorporated and its subsidiary companies (collectively, the "Company") and I desire to resolve fairly and quickly, any and all disputes between the parties as set forth below, including but not limited to those arising from and/or relating in any way to any aspect of my hiring, my employment and/or the severance of my employment.  In consideration of the binding mutual agreement of the parties to arbitrate claims between us, the agreement by the Company to pay the "AAA Filing Fee" (as that term is defined in Paragraph B, below), and the other mutual promises and agreements set forth herein, the Company and I agree as follows:

8

Final and binding arbitration before a single, neutral arbitrator shall be the exclusive remedy for any "Covered Claim" (as that term is hereinafter defined). A "Covered Claim" is any claim (except a claim that by law is non-arbitrable) that arises between me and the Company, its past, present, and future: parent(s), subsidiaries, affiliates, and/or their respective past, present, and future: officers, directors and/or employees, including but not limited to claims arising and/or relating in any way to my hiring, my employment with, and/or the severance of my employment with, the Company.

(Mutual Arbitration Agreement 1). The last two paragraphs of the Mutual

Arbitration Agreement state:

BY SIGNING THIS AGREEMENT, I KNOWINGLY AND VOLUNTARILY WAIVE FOR ANY COVERED CLAIM THE RIGHT TO CLASS, REPRESENTATIVE, AND COLLECTIVE PROCEDURES AND THE RIGHT TO TRIAL BY JURY OR JUDGE, TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW. I RETAIN ALL OTHER RIGHTS, INCLUDING MY RIGHT TO COUNSEL, TO CALL AND CROSS-EXAMINE WITNESSES, AND TO HAVE MY CLAIMS ADDRESSED BY AN IMPARTIAL FACT FINDER. I ACKNOWLEDGE THAT I AM HEREBY ADVISED TO SEEK LEGAL ADVICE AS TO MY RIGHTS AND RESPONSIBILITIES UNDER THIS AGREEMENT AND HAVE AVAILED MYSELF OF THE ADVICE OF COUNSEL TO THE EXTENT I WISH TO DO SO.

I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS AGREEMENT, AND THAT I UNDERSTAND ITS TERMS.

(*Id.* at 2-3). The Mutual Arbitration Agreement is signed, on behalf of ABM, by

the Vice President for Human Resources and is dated September 18, 2014. (*Id.*

at 3). Notably, the two documents referred to as "Employee Acknowledgment"

contain the exact same language as the last two paragraphs of the Mutual

9

Arbitration Agreement.  (*See* Employee Acknowledgment).  The two documents appear to be identical.  (*Id.*).

**B.    Procedural History**

Plaintiff filed the Complaint in this action on January 10, 2020, in the Supreme Court of the State of New York, New York County, alleging several tort causes of action as well as sexual harassment in violation of Title VII.  (Dkt. #1 at ¶ 1).  On February 18, 2020, the ABM Defendants filed a notice of removal, removing the case to this Court pursuant to 28 U.S.C. §§ 1331, 1441 and 1446, as an action founded on a claim or right arising under the laws of the United States.  (Dkt. #1, 7).  Defendant Sanders has yet to be served with this action.  (*See* Dkt. #7 at ¶ 9).

On February 21, 2020, the ABM Defendants filed a motion to compel arbitration and to dismiss or stay the action, as well as two supporting declarations.  (Dkt. #12-15).  Plaintiff filed a brief and several exhibits in opposition to the motion to compel on March 11, 2020.  (Dkt. #23).  The ABM Defendants filed a reply brief and affidavit on March 27, 2020.  (Dkt. #26-27).  Then, on March 31, 2020, Plaintiff filed a letter requesting leave to file a sur-reply and to conduct limited discovery.  (Dkt. #28).  The ABM Defendants filed a letter in opposition to Plaintiff's request the next day.  (Dkt. #29).  On April 1, 2020, the Court issued an order stating that it would hold Plaintiff's request until a later time when it could determine whether a sur-reply and discovery were warranted.  (Dkt. #30).  The Court has now reviewed the motion papers in

this case and has determined both that a sur-reply is unnecessary and that discovery is unwarranted.

## DISCUSSION

### A.    Applicable Law

The Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA"), "reflects a liberal federal policy favoring arbitration agreements and places arbitration agreements on the same footing as other contracts."  *Meyer* v. *Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (internal quotation marks and citations omitted).  Section 2 of the FAA provides, "[a] written provision in ... a contract ... to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Section 4 of the FAA allows a party to such an agreement to petition a district court for an order compelling arbitration where a counterparty "fail[s], neglect[s], or refus[es] ... to arbitrate" under the terms of an arbitration agreement.  *Id.* § 4.  A court ruling on a petition to compel arbitration must decide two issues: [i] whether the parties agreed to arbitrate, and, if so, [ii] whether the scope of that agreement encompasses the claims at issue.  *See Holick* v. *Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015).

In resolving a motion to compel arbitration, the court applies "a standard similar to that applicable for a motion for summary judgment."  *Meyer*, 868 F.3d at 74 (internal quotations omitted).  "[T]he court considers all relevant,

11

admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party." *Id.* (internal quotation marks, alterations, and citations omitted). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Bensadoun* v. *Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (citing 9 U.S.C. § 4). However, a party opposing arbitration may not satisfy this burden through "general denials of the facts on which the right to arbitration depends"; in other words, "[i]f the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Oppenheimer & Co., Inc.* v. *Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

## B.   Analysis

The ABM Defendants contend that the FAA mandates arbitration of Plaintiff's claim because: (i) the parties executed a valid arbitration agreement; and (ii) Plaintiff's claims against the ABM Defendants fall within the scope of such arbitration agreement. (Def. Br. 10). In resisting arbitration, Plaintiff contends that she never entered into a valid arbitration agreement and that ABM's onboarding practice is procedurally and substantively unconscionable. (Pl. Opp. 11-20). As detailed herein, the Court agrees with the ABM Defendants on both issues.

### 1.     The Parties Formed a Valid Arbitration Agreement

"The threshold question facing any court considering a motion to compel arbitration is whether the parties have indeed agreed to arbitrate." *Doctor's Assocs., Inc.* v. *Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) (internal quotations and alterations omitted).  The question is resolved with reference to state law.  *See Meyer*, 868 F.3d at 73-74; *Bell* v. *Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) ("Because an agreement to arbitrate is a creature of contract … the ultimate question of whether the parties agreed to arbitrate is determined by state law.").[2]

Plaintiff contends that the evidence that the ABM Defendants have submitted to the Court is insufficient to show that Plaintiff entered into an arbitration agreement with ABM.  Notably, while ABM's Human Resources Director, Rhonda Rawlins, described the onboarding process during which Plaintiff signed the Employee Acknowledgment, the ABM Defendants did not provide a copy of the Mutual Arbitration Agreement signed by Plaintiff herself. Rather, the ABM Defendants have submitted what appears to be ABM's standard Mutual Arbitration Agreement along with the Employee Acknowledgment, the latter of which appears to be the final page of such

---

[2]     Both Plaintiff and the ABM Defendants rely on New York law (*see* Def. Br. 10-11; Pl. Opp. 11); accordingly, the Court analyzes the purported arbitration agreement with reference to New York law.  *See Smith* v. *Mikki More, LLC*, 21 F. Supp. 3d 276, 283 (S.D.N.Y. 2014) ("'[W]here the parties agree that New York law controls, this is sufficient to establish choice of law.'" (quoting *Fed. Ins. Co.* v. *Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011))).

agreement and upon which Plaintiff's signature appears.  (*See* Rawlins Decl., Ex. B).

The ABM Defendants certainly would have done better by submitting a version of the Mutual Arbitration Agreement with Plaintiff's initials and signature attached.  However, when presented with arbitration agreements in contracts formed online between companies and their customers — or, as in this case, between employers and their employees — courts routinely rely on affidavits and declarations (similar to the Rawlins Declaration) describing and depicting how the affected individual manifested assent to the company's arbitration provision.  For example, in *Selden* v. *Airbnb, Inc.*, in granting a motion to compel arbitration, the court relied on a declaration from an Airbnb employee that explained the sign-up process and attached a rendering of the sign-up page as it would have appeared to the plaintiff at the time he signed up.  No. 16 Civ. 933 (CRC), 2016 WL 6476934, at *2-5 (D.D.C. Nov. 1, 2016). Similarly, in *Bernardino* v. *Barnes & Noble Booksellers, Inc.*, the Magistrate Judge's report and recommendation relied on a declaration of a Barnes & Noble employee that attached screenshots of images of the Barnes & Noble website obtained from the company's internal quality assurance server to determine that the parties entered into an agreement to arbitrate.  No. 17 Civ. 4570 (LAK) (KHP), 2017 WL 7309893, at *6-8 (S.D.N.Y. Nov. 20, 2017), *report and recommendation adopted as modified*, 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018), *aff'd*, 763 F. App'x 101 (2d Cir. 2019) (summary order).

In *Cordas* v. *Uber Technologies, Inc.*, the court relied on the declaration of an Uber engineer that described the rider sign-up and registration process and screenshots of the Uber app in determining whether the plaintiff had agreed to Uber's terms and conditions. 228 F. Supp. 3d 985, 989 (N.D. Cal. 2017). In so doing, that court rejected the plaintiff's argument that the declaration was insufficient to support Uber's motion to compel arbitration because it contained hearsay, was speculative, and lacked authentication. *Id.* The court explained that Cordas "offer[ed] no testimony or evidence regarding what he *did* see on his screen, and offer[ed] no evidence to rebut [the Uber engineer's] reasoned declaration other than his own conclusory allegations that he never received notice of the terms and conditions and that [the Uber engineer's] declaration is false and inadequate." *Id.* at 990 (emphasis in original). Instead, the court held that the Uber engineer's declaration was based on personal knowledge and on records kept by Uber in the ordinary course of business, and was therefore sufficient to find, as a matter of law, that Cordas had entered into an arbitration agreement with Uber. *Id.* at 989-90.

Given its holistic review of the record — which included matching up the Rawlins Declaration and the Mancilla Declaration — the Court finds that the ABM Defendants have satisfied their burden to show that Plaintiff agreed to the Mutual Arbitration Agreement. Plaintiff concedes that when she reported for work at ABM, she "was instructed to go online and complete the employment process," and that she "followed the online instructions to complete and process and [] signed documents electronically where [she] was instructed to do

so." (Mancilla Decl. ¶¶ 15, 17).  Further, she does not dispute that she signed the Employee Acknowledgement.  (*Id.* at ¶ 19).  And while she does contend that "she does not recall seeing" the Mutual Arbitration Agreement (*id.* at 20), this is insufficient to create a genuine issue of material fact as to whether the parties entered into an arbitration agreement.  *See Interbras Cayman Co.* v. *Orient Victory Shipping Co., S.A.*, 663 F.2d 4, 7 (2d Cir. 1981) ("To make a genuine issue entitling the plaintiff to a trial by jury [under 9 U.S.C. § 4], an *unequivocal denial* that the agreement had been made was needed, and some evidence should have been produced to substantiate the denial." (emphasis added)); *Brown* v. *St. Paul Travelers Cos., Inc.*, 331 F. App'x 68, 70 (2d Cir. 2009) (summary order) (holding that "plaintiff's statement that she has no recollection or record of receiving the employee handbook and arbitration policy … is not enough to raise a genuine issue of material fact" (internal alterations omitted)); *Overseas Private Inv. Corp.* v. *Kim*, 895 N.Y.S.2d 217, 219-20 (3rd Dep't 2010) (enforcing an agreement against a party who denied ever reading or seeing the entire agreement and who alleged that she was only provided with the page of the agreement that bore her signature).

The decision of a sister court in this District in *Marciano* v. *DCH Auto Grp.*, 14 F. Supp. 3d 322, 328-30 (S.D.N.Y. 2014), is also instructive.  There, the plaintiff argued that although her signature appeared on the arbitration agreement authorization page, she never agreed to arbitrate her claims because the language relating to arbitration was not on any page that she saw or signed.  *Id.* at 328.  The court rejected this argument, explaining that "under

16

New York law, 'a party is under an obligation to read a document before he or she signs it, and a party generally cannot avoid the effect of a document on the ground that he or she did not read or know its contents.'" *Id.* (internal alterations omitted) (quoting *Brandywine Pavers, LLC* v. *Bombard*, 970 N.Y.S.2d 653, 655 (4th Dep't 2013)).  More pointedly, the court observed that:

> a signer's duty to read and understand that which it signed is not diminished merely because the signer was provided with only a signature page.  *Dasz, Inc.* v. *Meritocracy Ventures, Ltd.*, 108 A.D.3d 1084, 969 N.Y.S.2d 653, 655 (2013) ... *see also Overseas Private Inv. Corp.* v. *Kim*, 69 A.D.3d 1185, 895 N.Y.S.2d 217, 219-20 (2010) (enforcing an agreement against a party who claimed that "she was only provided with the last page of the agreement" and that "she signed it without seeing the entire document").  Thus, Plaintiff's contention that she did not read the entire Arbitration Agreement, by itself, does not create a material factual dispute, because a party who signs a document without any valid excuse for having failed to read it is conclusively bound by its terms.

*Id.* at 330 (internal quotation marks omitted).

While Plaintiff contends that the Mutual Arbitration Agreement and Employee Acknowledgment are not an integrated document (*see* Pl. Opp. 14-16), it is clear from reading both agreements that the Employee Acknowledgment does not exist without the Mutual Arbitration Agreement.[3]

---

[3]  Plaintiff's brief makes several factual assertions that are unsupported by her affidavit or any other record evidence.  For example, Plaintiff's brief asserts that: (i) "[Plaintiff] was not provided [the Mutual Arbitration Agreement] at the time she was hired by ABM or anytime thereafter" (Pl. Opp. 7); (ii) the Employee Acknowledgment was "the only arbitration document presented to" Plaintiff (*id.* at 13); and (iii) the Mutual Arbitration Agreement and Employee Acknowledgment "were not presented to [Plaintiff] as a combined, unified document" (*id.* at 14).  These statements are not substantiated by Plaintiff's affidavit, which merely states that she reviewed and signed the Employee

The Employee Acknowledgement refers to a "Covered Claim."  However, "Covered Claim" is not a standalone term and is defined only in the Mutual Arbitration Agreement.  Further, the text of the Employee Acknowledgment is identical to the bolded text at the end of the Mutual Arbitration Agreement.[4]

## 2. The Mutual Arbitration Agreement Is Not Unconscionable

Alternatively, Plaintiff claims that the Court should rejected ABM's Mutual Arbitration Agreement as unconscionable.  "Under New York law, a contract is unconscionable when it is so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Ragone* v. *Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (internal quotation marks and alterations omitted).  "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made[.]" *Gillman* v. *Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988).

Substantive unconscionability involves questions about the fundamental fairness of the agreement as a whole, or specific clauses within the agreement. *Berkson* v. *Gogo LLC*, 97 F. Supp. 3d 359, 391 (E.D.N.Y. 2015).  "The procedural element of unconscionability requires an examination of the

---

Acknowledgment and "does not recall seeing" the Mutual Arbitration Agreement. (Mancilla Decl. ¶¶ 19-20).  The Court does not consider these unsupported assertions.

[4]     Plaintiff provides a string cite of cases in which courts have denied motions to compel arbitration on various grounds.  (*See* Pl. Opp. 16-17).  Of course, where circumstances warrant, it is appropriate for a court to deny a motion to compel.  But Plaintiff fails to explain how any of these cases is relevant to *this* motion.

contract formation process and the alleged lack of meaningful choice. The focus is on such matters as the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." *Am. Family Life Assur. Co. of N.Y.* v. *Baker*, 778 F. App'x 24, 26 (2d Cir. 2019) (summary order) (citations omitted).

Plaintiff argues that the massive disparity in bargaining power between her and ABM renders the arbitration agreement procedurally unconscionable. (*See* Pl. Opp. 17-18). The Court is sympathetic to the fact that Plaintiff was certainly in a far less powerful position than ABM during her onboarding process. However, "[m]ere inequality in bargaining power between employers and employees is not alone sufficient to hold arbitration agreements unenforceable." *Gold* v. *Deutsche Aktiengesellschaft*, 365 F.3d 144, 150 (2d Cir. 2004), *cert. denied*, 543 U.S. 874 (2004); *see also Tarulli* v. *Circuit City Stores, Inc.*, 333 F. Supp. 2d 151, 156 (S.D.N.Y. 2004) ("[T]he Plaintiff contends that the Agreement is procedurally unconscionable because of the disparity in bargaining power between the Plaintiff, a non-lawyer, individual, and the Defendant, a large corporation. If the Plaintiff's contention were accepted, no non-lawyer, individual could contract with a large corporation without the advice of counsel."). Thus, the fact that Plaintiff, who was seeking employment with ABM, may have been offered such employment on a take-it-or-leave-it

basis is not, by itself, legally sufficient to establish procedural unconscionability.

The Court is similarly sensitive to the relative speed with which Plaintiff was both hired and onboarded, but this fact too does not establish that ABM used deceptive or high-pressured tactics to induce her to sign the agreement. *Suqin Zhu* v. *Hakkasan NYC LLC*, 291 F. Supp. 3d 378, 391 (S.D.N.Y. 2017) (rejecting the argument that an arbitration agreement was procedurally unconscionable because plaintiffs, who did not read or understand English, did not make reasonable efforts to have the agreement explained to them, as required by New York law); *Moss* v. *Rent-A-Center, Inc.*, No. 06 Civ. 3312 (SLT) (KAM), 2007 WL 2362207, at *5 (E.D.N.Y. Aug. 15, 2007) ("If Plaintiffs did not understand the form of the arbitration agreement or had questions about it, the burden was upon them to have their concerns addressed before placing their signatures on the agreement."); *see also Ragone*, 595 F.3d at 122 ("New York law does not absolve [Plaintiff] of th[e] obligation [to read a document carefully before signing it] because she does not have a college degree and has no experience or background in business or human resource." (internal quotation marks omitted)).

Plaintiff further argues that the arbitration agreement is substantively unconscionable because of the broad scope of the term "Covered Claim." (*See* Pl. Opp. 19). Indeed, the Mutual Arbitration Agreement requires both the employee and employer to submit to arbitration "any claim (except a claim that by law is non-arbitrable) that arises between me and the Company ... including

20

but not limited to claims arising and/or relating in any way to my hiring, my employment with, and/or the severance of my employment with, the Company." (Mutual Arbitration Agreement 1). However, courts routinely enforce arbitration agreements between employees and employer by which they agree to refer all claims arising from the employment relationship to arbitration. *See, e.g., Tarulli*, 333 F. Supp. 2d at 157 ("[T]he Supreme Court and Second Circuit have both held that conditioning employment on the acceptance of an agreement to arbitrate disputes, including those arising under civil rights laws, is not itself unlawfully coercive." (internal quotations marks omitted)); *Wework Cos. Inc.* v. *Zoumer*, No. 16 Civ. 457 (PKC), 2016 WL 1337280, at *6 (S.D.N.Y. Apr. 5, 2016) (enforcing arbitration agreement that "subjected both parties to mandatory arbitration for any claims arising out of or related to respondent's employment"). Importantly, the Mutual Arbitration Agreement is not one-sided: it subjects both parties to mandatory arbitration for any claims arising out of Plaintiff's employment. In sum, the Court declines Plaintiff's request to nullify the parties' arbitration agreement and, further, concludes that Plaintiff's claims, while egregious, fall within the scope of that agreement.

### 3.    The Case Is Stayed

Having concluded that the Mutual Arbitration Agreement is enforceable and that Plaintiff's claims fall within its broad scope, the Court must decide whether to dismiss or stay the action. When all claims have been referred to arbitration and a stay is requested, the Court must grant the stay. *See Katz* v.

*Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015).  Here the ABM Defendants request either dismissal or stay of this action.  (*See* Def. Br. 16-17).  Following *Katz*, courts in this Circuit regularly stay, rather than dismiss, complaints subject to an arbitration agreement.  *See, e.g., TIG Ins. Co.* v. *Am. Home Assurance Co.*, No. 18 Civ. 10183 (VSB), 2020 WL 605974, at *4 (S.D.N.Y. Feb. 7, 2020); *Porcelli* v. *JetSmarter, Inc.*, No. 19 Civ. 2537 (PAE), 2019 WL 2371896, at *4 (S.D.N.Y. June 5, 2019); *Crawley* v. *Macy's Retail Holdings, Inc.*, No. 15 Civ. 2228 (KPF), 2017 WL 2297018, at *6 (S.D.N.Y. May 25, 2017); *see also Bernardino*, 763 F. App'x at 104.  Accordingly, the Court will stay, rather than dismiss, this action.

### 4.     Plaintiff's Request to Submit a Sur-Reply and for Discovery Is Moot

Plaintiff has asked the Court for leave to file a sur-reply and to conduct limited discovery relevant to the instant motion.  (Dkt. #28).  Plaintiff's request is premised on the fact that "Defendant ABM's reply memorandum injected new matter not previously disclosed by Defendant ABM and for which Plaintiff had no opportunity to respond."  (*Id.* at 1).  Specifically, Plaintiff complains that the Rawlins Reply Declaration provided the Court with "new information and exhibits that were not made available with Defendant ABM's motion."  (*Id.*).

The Court understands Plaintiff's desire to respond to new statements raised in the Rawlins Reply Declaration.  However, the Court has not relied on such statements in resolving the present motion.  Accordingly, Plaintiff has not been prejudiced by the additional submission and the Court does not need

further briefing or discovery.  *See Lujan* v. *Nat'l Wildlife Fed'n*, 497 U.S. 871, 894-98 (1990) (court has discretion to admit new evidence on reply if that new evidence simply rebuts evidence submitted by the answering party on response and the non-moving party is not prejudiced).

## CONCLUSION

For the reasons stated in this Opinion, the ABM Defendants' motion to compel arbitration is GRANTED.  The Clerk of Court is ORDERED to terminate the motion at docket entry 12.  The Court further orders that this case be STAYED as to the ABM Defendants pending completion of the arbitration.

Plaintiff and the ABM Defendants are ORDERED to update the Court on or before **October 30, 2020**, regarding the status of any arbitration.

Further, Plaintiff is ORDERED to notify the Court, on or before **August 7, 2020**, as to whether she intends to pursue this action against Defendant Eddie Sanders.

SO ORDERED.

Dated:      July 28, 2020
            New York, New York

                                    _____
                                        KATHERINE POLK FAILLA
                                        United States District Judge

23